## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| SHARON McCORMACK, Derivatively on Behalf of Nominal Defendant LHC GROUP, INC.,<br><br>Plaintiff,<br><br>v .<br><br>KEITH G. MYERS, DONALD D. STELLY, PETER J. ROMAN, W.J. "BILLY" TAUZIN, MONICA F. AZARE, SENATOR JOHN B. BREAUX, TED W. HOYT, JOHN L. INDEST, GEORGE A. LEWIS, RONALD T. NIXON, KENNETH E. THORPE, DAN S. WILFORD, ANGIE M. BEGNAUD, and BARBARA GOODMAN,<br><br>Defendants,<br><br>a n d<br><br>LHC GROUP, INC., a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No. |

## NOTICE OF COLLATERAL PROCEEDINGS
## PURSUANT TO LOCAL RULE 3.1

Pursuant to Local Rule 3.1, Plaintiff Sharon McCormack hereby notifies the Court that the above-captioned shareholder derivative action, filed simultaneously herewith on behalf of nominal defendant LHC Group, Inc., is related to the securities class action also pending before this Court and assigned to the Honorable James T. Trimble, Jr., captioned *City of Omaha Police & Fire Ret. Sys. v. LHC Group, Inc.*, No. 6:12-cv-01609-JTT-CMH, as well as the action also pending before this Court and assigned to the Honorable James T. Trimble, Jr., captioned *Plummer v. Myers et al.*, No. 6:13-cv-02899-JTT-CMH.

Respectfully Submitted,

Dated: December 30, 2013                    O'BELL LAW FIRM, LLC


By:  /s/ Eric J. O'Bell
     _____

          Eric J. O'Bell (LA. Bar #26693)
          O'BELL LAW FIRM, LLC
          3500 North Hullen Street
          Metairie, Louisiana 70002
          Telephone: (504) 456-8677
          Facsimile: (504) 456-8653

          JOHNSON & WEAVER, LLP
          Frank J. Johnson
          *Pro Hac Vice Anticipated*
          Nathan R. Hamler
          110 West "A" Street, Suite 750
          San Diego, CA 92101
          Telephone: (619) 230-0063
          Facsimile: (619) 255-1856
          E-mail:  frankj@johnsonandweaver.com

          *Counsel for Derivative Plaintiff*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| SHARON McCORMACK, Derivatively on Behalf of Nominal Defendant LHC GROUP, INC., | Civil Action No. |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| KEITH G. MYERS, DONALD D. STELLY, PETER J. ROMAN, W.J. "BILLY" TAUZIN, MONICA F. AZARE, SENATOR JOHN B. BREAUX, TED W. HOYT, JOHN L. INDEST, GEORGE A. LEWIS, RONALD T. NIXON, KENNETH E. THORPE, DAN S. WILFORD, ANGIE M. BEGNAUD, and BARBARA GOODMAN, | |
| Defendants, | |
| and | |
| LHC GROUP, INC., a Delaware corporation, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through her undersigned counsel, Plaintiff Sharon McCormack ("Plaintiff") brings this shareholder derivative action on behalf of LHC Group, Inc. ("LHC" or the "Company") and against certain officers and directors of the Company for breaches of fiduciary duties and unjust enrichment.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by LHC and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications,

1

and postings on LHC's website concerning the Company's public statements; and d) review of other publicly available information concerning LHC and the Individual Defendants (defined herein).

## NATURE OF THE ACTION

1.      LHC is a Lafayette, Louisiana-based provider of post-acute health care services to patients through home nursing agencies, hospices, and long-term acute care hospitals.  On its website, LHC describes itself as "the preferred post-acute care partner for hospitals, physicians and families nationwide.  From home health and hospice care to long-term acute care and private duty services, we deliver high-quality, cost-effective care that empowers patients to manage their health at home."

2.      By far, LHC's largest business segment is its home health segment, which provides services through home nursing agencies and hospices.  Between 2008 and 2011, LHC's home health segment accounted for between 85.1% and 88.2% of LHC's revenue.  Furthermore, a substantial portion of these home health segment revenues is derived through Medicare payments made to the Company.

3.      This action arises out of the efforts of the Individual Defendants from approximately July 30, 2008 through October 26, 2011 (the "Relevant Period") to artificially inflate the price of LHC's common stock by issuing, or authorizing the issuance of, materially false and misleading statements regarding the Company's revenues derived through LHC's home health care segment.  During the Relevant Period, the Individual Defendants caused the Company to announce revenues from its home health care segment that increased significantly, both quarter-over-quarter and year-over-year.  But the Individual Defendants failed to disclose that the Company achieved much of this dramatic growth because the Individual Defendants had caused the Company to systematically abuse and defraud the Medicare home health care program.

4.      In particular, to maximize the Company's revenue and specifically its Medicare revenue, the Individual Defendants caused LHC to manipulate the number of home visits that patients received, regardless of whether some patients actually needed those services.  Medicare pays home healthcare providers like LHC for each home visit, but also pays home healthcare providers certain "bonus" payments when specified visit thresholds are met.  Before 2008, Medicare paid such a bonus after a provider made ten visits to a home patient.  In 2008, however, Medicare's bonus policy was changed, to pay bonuses at thresholds of six, 14, and 20 visits.

5.      To maximize revenue from Medicare, the Individual Defendants caused LHC to engage in a systematic and concerted effort to instruct, and in some cases outright pressure, its healthcare providers to meet the new bonus thresholds, regardless of patient need.  Tellingly, from 2007 to 2008, the proportion of patients receiving six visits increased by an astounding 126%. Similarly, the proportion of patients receiving 14 visits increased by 75%.  And the proportion of patients receiving 20 visits increased nearly 2-fold, by 189%.  In stark contrast, the number of patients receiving 10 visits – the old "bonus" visit threshold – declined by 67% from 2007 to 2008. As a result, from at least mid-2008 and continuing throughout the Relevant Period, the Individual Defendants caused LHC to tout substantially inflated revenues and revenue growth numbers stemming from LHC's home health segment.

6.      Moreover, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to LHC and its shareholders by consciously failing to take reasonable steps to implement and ensure compliance with adequate internal controls and compliance measures, while misleadingly claiming otherwise to the investing public.  Indeed, the Individual Defendants repeatedly caused LHC to reassure investors that the Company was in compliance with all applicable laws, caused the Company to tout the quality and comprehensiveness of its internal controls and compliance measures, and even caused LHC to boast how its robust compliance protocols created a competitive advantage for the Company.

7.      Starting in or around April of 2010, however, the Company's Medicare manipulation practices began to be called into question.  First, an April 26, 2010 *Wall Street*

3

*Journal* article titled "Home Care Yields Medicare Bounty," which analyzed LHC's home therapy utilization patterns, opined that the Company was improperly taking advantage of the Medicare reimbursement system by providing medically unnecessary care to home patients.

8.     Closely on the heels of the April 2010 *Wall Street Journal* article, the Senate Finance Committee initiated an investigation into whether companies that provide in-home therapy visits reimbursed by Medicare, including LHC, deliberately boosted the number of home therapy visits to patients to trigger higher Medicare bonus payments.  On May 12, 2010, LHC issued a press release disclosing that it had received a request for information from the Senate Finance Committee, but denying the allegations in the article.  Specifically, the press release claimed: "All home care services, including therapy, are dictated by an independent physician order." The press release also attributed increases in revenue to increases in patient population.  LHC's stock declined over 7% in the two days following the May 12, 2010 announcement of the initiation of the Senate Finance Committee's investigation.

9.     Two months later, on July 13, 2010, LHC disclosed that it was also being investigated by the SEC regarding LHC's Medicare billing practices.  This announcement spurred another decline in LHC's stock price, which declined over 8.8% from the Company's July 13, 2010 announcement through July 19, 2010.

10.     On or about October 3, 2011, the Senate Finance Committee released a report entitled, "A Staff Report on Home Health and the Medicare Therapy Threshold" (the "Finance Committee Report").[1]   The Finance Committee Report concluded that LHC encouraged its therapists to provide the most profitable number of therapy visits even when patient need may not

---

[1] The complete Finance Committee Report is available online for viewing and download at: http://www.finance.senate.gov/newsroom/chairman/release/?id=e32d81a2-da53-4d9c-bccc-1c50a1f33f5e.  Plaintiff hereby incorporates the contents of the Finance Committee Report by reference as if set forth fully herein.

have justified that number of visits.  The Finance Committee Report also concluded that LHC concentrated numbers of therapy visits at or just above the point that triggered a "bonus" payment from Medicare.  The Finance Committee Report stated that these practices, at best, "represent abuses" of Medicare and "at worst may be examples of for-profit companies defrauding the program at taxpayer's expense."

11.    The Finance Committee Report also appended, among other documents, highly incriminating documents that were produced by LHC to the Senate Finance Committee as part of the Committee's review and investigation.  These documents, discussed in detail in this complaint, confirm that the Individual Defendants knowingly approved the Company's improper and widespread practice of targeting the most profitable number of therapy visits without regard for patients' medical needs.

12.    LHC's stock price closed at $17.06 per share on September 30, 2011, the last day of trading preceding the publication of the Finance Committee Report.  Following the Finance Committee Report's publication on October 3, 2011, LHC's stock price dropped 12%, closing at $15.01 per share on October 4, 2011.

13.    Furthermore, during the Relevant Period—while the Individual Defendants orchestrated or allowed the Company to report inflated revenues by systematically abusing and defrauding the Medicare home health care program, and while the Individual Defendants offered numerous assurances that the Company's internal controls compliance protocols were comprehensive, robust, and effective—Keith G. Myers ("Myers") (the Company's Chief Executive Officer ("CEO")) and John L. Indest ("Indest") (a long-time director, former officer, and special advisor to the CEO), collectively sold millions of dollars-worth of their personal holdings of LHC stock.  Myers sold over $6 million of stock, alone, on the two trading days immediately preceding the Company's May 12, 2010 announcement of the Senate Finance Committee's inquiry.

14.    Also during the Relevant Period, Myers violated section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") by making false or materially misleading statements

concerning the nature and source of the Company's home care revenue and revenue growth, the Company's purported compliance with applicable laws, and the purported comprehensiveness and effectiveness of the Company's internal controls and compliance protocols, while at the same time Myers directed and orchestrated the repurchase of $577,000 of the Company's stock at prices he knew were inflated.  The Director Defendants (as defined herein), who exercised actual power and control over the actions of Myers, are jointly and severally liable under section 20(a) of the Exchange Act for the false and misleading statements and the Company's repurchase of stock at inflated prices.

15.     As a result of the Individual Defendants' wrongdoing, the Company has sustained damages, including, but not limited to: (a) costs and expenses incurred in connection with the investigations by the SEC and the Senate Finance Committee (b) costs and expenses incurred in having to defend a federal securities action brought against the company and certain officers plus potentially millions or billions of dollars in settlement or to satisfy an adverse judgment; (c) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation, at least with respect to the Officer Defendants (defined herein), was based at least in part on LHC's artificially-inflated stock price; (d) costs incurred from the misappropriation of Company information by Myers and Indest for the purposes of selling LHC common stock at artificially inflated prices; (e) costs incurred from the Company buying back shares $577,000 worth of shares of Company stock at prices inflated through the Individual Defendants' misconduct; and (f) damages incurred from customers' loss of confidence in LHC and its products and services.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction in this case under Article III of the United States Constitution and 28 U.S.C. § 1331 because it includes claims arising under the Exchange Act.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the

same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     The Court also has jurisdiction over the claims asserted under state law pursuant to 28 U.S.C. §1332, because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this Court because LHC's corporate headquarters and principal executive offices are located at 420 West Pinhook Road, Lafayette, Louisiana 70503, where the day-to-day operations of the Company are directed and managed.  Moreover, Plaintiff's claims arose in this District, Plaintiff has suffered and will continue to suffer harm in this District, and each Defendant has extensive contact with Louisiana.

## PARTIES

19.     Plaintiff is, and at all relevant times has been, a holder of LHC common stock. Plaintiff purchased LHC common stock before the beginning of the Relevant Period, held LHC common stock throughout the entire Relevant Period and continues to hold LHC common stock. Plaintiff is a citizen of the state of West Virginia.

20.      Nominal Defendant LHC is a Delaware corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 420 West Pinhook Road, Lafayette, Louisiana 70503.  LHC's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "LHCG."   LHC provides post-acute health care services to patients through home nursing agencies, hospices, and long-term acute care hospitals.

21.     Myers, co-founder of the Company, has served as Chairman of the Board and CEO since 1994.  Myers served as President of the Company from 1994 to 1997, and again from August 2009 to November 2010.  Upon information and belief, Myers is a citizen of the state of Louisiana.

22.     Defendant Donald D. Stelly ("Stelly") has served as the Company's President and Chief Operating Officer ("COO") since November 2010.   Previously, Stelly served as the Company's Executive Vice President, COO, and Senior Vice President of Operations.   Upon information and belief, Stelly is a citizen of the state of Louisiana.

23.     Defendant Peter J. Roman ("Roman") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since 2007.  Previously, Roman was Vice President and Controller at the Company.  Upon information and belief, Roman is a citizen of the state of Louisiana.

24.     Defendant W.J. "Billy" Tauzin ("Tauzin") has served as Lead Director of the Company since January 2005.  Tauzin has served as a member of the Board's Compensation Committee (the "Compensation Committee") and as a member of the Board's Nominating and Corporate Governance Committee (the "Nominating Committee") since 2012 (and also served on the Nominating Committee from 2005 to 2009).  Upon information and belief, Tauzin is a citizen of the District of Columbia.

25.     Defendant Monica F. Azare ("Azare") has served as a director of the Company since November 2007.  Azare has served as a member of the Compensation Committee since 2007 and as its Chair since 2008.  She is also a member and former Chair of the Board's Clinical Quality Committee (the "Clinical Quality Committee").  Upon information and belief, Azare is a citizen of the state of New York.

26.     Defendant Senator John B. Breaux ("Breaux") has served as a director of the Company since February 2007.  Breaux has been a member of the Nominating Committee since 2007 and the Compensation Committee since 2012.  Upon information and belief, Breaux is a citizen of the state of Florida.

27.     Defendant Ted W. Hoyt ("Hoyt") has served as a director of the Company since August 2004.  Hoyt has served as a member of the Board's Audit Committee (the "Audit Committee") and the Compensation Committee since 2004.  Previously, he served as Chair of the Compensation Committee and as a member and Chair of the Nominating Committee.  Upon information and belief, Hoyt is a citizen of the state of Louisiana.

28.     Defendant Indest has served as a director of the Company since June 2000 and as a consultant to the Company since September 2011.  Indest also served as Special Advisor to the CEO from August 2009 to August 2011, the Company's President from September 2007 to August 2009, and as the Company's COO from 2005 to June 2009.  Indest held various other positions with the Company before becoming COO in 2005.  Indest has also served as Chair of the Clinical Quality Committee since the committee's inception.  Upon information and belief, Indest is a citizen of the state of Louisiana.

29.     Defendant George A. Lewis ("Lewis") has served as a director of the Company since August 2004.  Lewis has served as Chair of the Audit Committee since 2004 and is a former member of the Compensation Committee.  Upon information and belief, Lewis is a citizen of the state of Louisiana.

30.     Defendant Ronald T. Nixon ("Nixon") has served as a director of the Company since July 2001.  Nixon has served as a member of the Nominating Committee since 2004 and Chair of the Board's Corporate Development Committee (the "Development Committee") since 2012, and previously served on the Audit Committee from 2004 to 2011.  Upon information and belief, Nixon is a citizen of the state of Texas.

31.     Defendant Kenneth E. Thorpe ("Thorpe") has served as a director of the Company since February 2010.  Thorpe has served as a member of the Clinical Quality Committee since 2010 and the Development Committee since 2012.  Upon information and belief, Thorpe is a citizen of the state of Georgia.

32.     Defendant Dan S. Wilford ("Wilford") has served as a director of the Company since November 2005.  Wilford has served as a member of the Nominating Committee since 2005

and as its Chair since 2010.  He has served on the Clinical Quality Committee since 2009, the Audit Committee since 2012, and served on the Compensation Committee from 2006 to 2008. Upon information and belief, Wilford is a citizen of the state of Texas.

33.     Defendant Barbara Goodman ("Goodman"), who joined the Company in 2000, has served as the Company's Senior Vice President/Clinical Services since January 2010.  Upon information and belief, Goodman is a citizen of the state of Louisiana.

34.     Defendant Angie M. Begnaud ("Begnaud") has served as the Company's Senior Vice President/Home Care Operations since January 2010.  Since joining the Company in 1998, Begnaud has served as Division Vice President of Home Based Operations and in various other management positions.  Upon information and belief, Begnaud is a citizen of the state of Louisiana.

35.     Defendants referenced above in ¶¶21-34 are referred to herein as the "Individual Defendants."

36.     Defendants Myers, Tauzin, Azare, Breaux, Hoyt, Indest, Lewis, Nixon, Thorpe, and Wilford are collectively referred to as the "Director Defendants."

37.     Defendants Hoyt, Lewis, and Nixon, who, as described above, each served on the Audit Committee during the Relevant Period, are sometimes collectively referred to herein as the "Audit Committee Defendants."

38.     Defendants Azare, Indest, Thorpe, and Wilford are sometimes collectively referred to herein as the "Clinical Quality Committee Defendants."

39.     Defendants Myers, Stelly, Roman, Goodman, and Begnaud are sometimes collectively referred to herein as the "Officer Defendants."

## BACKGROUND FACTS

## LHC's Home Health Segment

40.     LHC provides home health services and hospice care throughout the United States.  The Company's operations include two business segments: (1) home-based,

or "home health" services, offered through home nursing agencies and hospices; and (2) facility-based services, offered through long-term acute care hospitals and outpatient rehabilitation clinics.

41.     The home health services provided by the Company include physical therapy, occupational therapy, and speech therapy.

42.     LHC's home health care segment is its primary source of revenue, generating over 80% of the Company's total revenue:

| Fiscal Year Ended December 31, | Consolidated Net Services Revenue | Home-Based Services Revenue ($) | Home-Based Services Revenue (% of Total) |
|---|---|---|---|
| 2007 | $298,031,000 | $244,107,000 | 81.9% |
| 2008 | $383,296,000 | $326,041,000 | 85.1% |
| 2009 | $531,980,000 | $469,470,000 | 88.2% |
| 2010 | $635,031,000 | $558,574,000 | 88.0% |
| 2011 | $633,872,000 | $557,901,000 | 88.0% |
| 2012 | $637,569,000 | $563,741,000 | 88.4% |

43.     Additionally, as the following chart details, the vast majority of the Company's revenue is received from Medicare:

| Fiscal Year Ended December 31, | Percentage of Net Service Revenue Derived from Medicare Payments |
|---|---|
| 2007 | 81.7% |
| 2008 | 83.2% |
| 2009 | 81.7% |
| 2010 | 80.1% |
| 2011 | 79.7% |
| 2012 | 77.9% |

**The 10 Home Visit Medicare "Bonus" Threshold**

44.     In 1997, the Medicare Home Health Prospective Payment System ("PPS") was implemented.  Through PPS, the Centers for Medicare and Medicaid Services ("CMS") created a

payment protocol for home health services, through which agencies would receive a flat rate for a 60-day period, or "episode" of care.  CMS intended for this protocol to cover the broad range of care needs for individuals who were restricted to their homes for a 60-day period.

45.     From 2000 to 2007, the Medicare payment system also provided for a therapy "bonus" (in addition to the flat rate for a 60-day period of home health care) if an agency provided a patient with at least 10 "therapy" visits.  These bonus payments were substantial, and as CMS recognized, susceptible to manipulation.  According to CMS data, if a home healthcare agency provided 10 visits as opposed to 9 visits, it increased its Medicare reimbursement on average by 97.5% (over $2,000 per patient) in 2007.  The idea in establishing the 10 therapy visit "bonus" threshold was to prevent and discourage "stinting," a term used for rendering the lowest possible level of services necessary to collect Medicare payment.

46.     Not surprisingly, after the 10 therapy visit "bonus" threshold was implemented, patterns developed, of home health therapy reimbursement claims concentrated at or just above the thresholds at which the greater Medicare "bonus" payment was triggered.  Specifically, the Medicare Payment Advisory Commission ("MedPAC") found that claims with the number of therapy visits between 10 and 13 increased by about 90% between 2002 and 2007, while the percentage of claims with numbers immediately above and below the 10-13 therapy visit range remained relatively unchanged during that period.

47.     CMS observed similar results, finding that the 10-13 therapy visit range had the highest concentration among claims for reimbursement for home health therapy, and specifically that, of all the claims at or above the 10-visit threshold, half were concentrated in the 10-13 range.

**The Modification of the Medicare Bonus Thresholds to a Three-Tiered "Bonus Payment" System at Thresholds of 6, 14, and 20 Visits**

48.     Responding to the evident clustering of therapy visits at the 10-visit threshold, CMS considered, and ultimately adopted, significant modifications to the therapy reimbursement system.  Specifically, beginning in 2008, CMS implemented 6-, 14-, and 20-visit

thresholds.  Under this modified system, home health agencies would see a substantially higher payout for episodes that reached the higher thresholds.

49.     In response, home health companies, including LHC, immediately altered their treatment patterns, resulting in what MedPAC called "the swiftest one-year change in therapy utilization since PPS was implemented."  Prevalent numbers of therapy visits by home health companies shifted from the original 10-visit threshold to the new 6-, 14-, and 20-visit thresholds.  According to MedPAC, "payment for episodes with 6 to 9 visits increased by 30%" and "payment for episodes with 14 or more therapy visits increased by 26%."  Additionally, "the number of episodes at 10 to 13 therapy visits dropped approximately 28%."

50.     Indeed, as discussed below, documents LHC apparently produced to the Senate Finance Committee in response to the Committee's investigation of LHC's (and others') practices show that, both before and after the changes were made to the bonus thresholds in 2008, the Individual Defendants caused LHC to engage in a concerted practice and effort to ensure that LHC's ordered treatment protocols matched the newly-modified thresholds.

### LHC's Improper Medicare Billing Policies and Practices

51.     The Finance Committee Report, as well as the internal LHC documents appended to the Finance Committee Report, unquestionably show that the Individual Defendants knew, or with the exercise of a minimal level of due care, would have known, of the Company's improper Medicare billing practices and the fact that these practices were widespread.  In particular, the documents show, the Company, at the direction, under the control of, and with the knowing consent of the Individual Defendants, manipulated therapy episodes to trigger higher Medicare reimbursement rates as a result of the changes to the payment system in 2008.

52.     For example, the Finance Committee Report shows that, in 2007, 20% of LHC's therapy episodes reported 10 visits while only 2.6% of the therapy episodes reported 9 visits.  In

2008, however—when 10 visits no longer triggered a bonus—the number of therapy episodes that included 10 visits dropped substantially, to 6.9%.

53.    Conversely, as the Finance Committee Report shows, LHC's percentage of home therapy episodes including six visits more than doubled from 2.5% in 2007 (when six visits did not trigger a bonus payment), to 5.5% in 2008 (when six visits became a bonus threshold).  And, from 2007 to 2008, LHC's percentage of home therapy episodes including 14 visits increased from 4.6% to 8%, and the percentage of home therapy episodes including 20 visits tripled from 0.7% to 2.1%.

### Before the 2008 Bonus Threshold Changes, the Individual Defendants Caused LHC to Systematically Target the 10-visit Threshold

54.    Before the 2008 threshold changes, internal LHC documents show, therapists were coached to make the 10-visit threshold regardless of whether 10 visits were medically necessary. For example, a June 5, 2007 email from Mississippi Regional Manager Cindy Keeton to Area Manager Liz Regard, copying Liz Starr (Vice President-Home Based Operations Division) and Sonya Owens, discusses a physical therapist at the Company's Brandon, Missouri location who refused to manage her practice to the 10-visit threshold, and, as a result, was counseled and redirected by physical therapist Rocky Goodwin ("Goodwin"):

> Throughout her time here it has been a constant battle with her regarding the 10 visit threshold. She even bucks when a MD orders a specific frequency and if she feels they do not need it then she refuses....You can see that I have an unusual situation in setting this employee educated on home health therapy as related to hospital. It was suggested that you might have a therapist that would be willing to come here and work with her. I think the name Rocky was mentioned.

*See* Finance Committee Report, at pp. 21, 613-15.

55.    Similarly, in a July 8, 2007 email from Goodwin to Area Manager Thressa Guchereau, copying Indest, Pam Bridges, Pat Derouen, Liz Regard, and Lynda Downard, which memorializes Goodwin's instructions given to another physical therapist, Goodwin notes: "I

explained that 10 visits is not etched in stone but that 5-9 visits is killer.  He voiced knowledge of the threshold concept and the bell curve.  I explained the background of the 10 visit concept and the financials involved."  *See* Finance Committee Report, at pp. 22, 616-18.   Goodwin also explained: "I gave him several pointers as to how to 'finish out' a therapy episode where only 6-9 visits are on the book and he needs something else to do to get to 10 visits.  There are several old tricks up my sleeve that I told him about from a clinical standpoint that he should feel better about using to go to the 10 visits."  *Id*.  In response to Goodwin's July 8 email, Liz Regard wrote in an email dated that same day: "Perfect!!  Don't know why I feel like I have to give you hints!!"  *Id*.

56.    Notably, as discussed in an October 1, 2007 email from Liz Regard to Jessica VanBuskirk, the Company regularly used Goodwin to train incoming physical therapists on how to manipulate therapy episodes to trigger higher Medicare rates:

> Pat said that he thought that Tasha had information that would tell us the types of patients that Medicare would see justification for 6 therapy visits, 14 therapy visits, etc. this is hard to put into words exactly but basically, should CMS audit a chart next year of a patient with greater than 14 visits, what type of patient would they be expecting to find. Same thing with 6 therapy visits. Same thing with 20 therapy visits....I am trying to get Rocky Goodwin PT in Shreveport who assists the start up team occasionally in an education role in our region. I see this so badly needed for training/transitioning of the different offices in relation to therapy in the new payment system.

*See* Finance Committee Report, at pp. 22, 619-20.

## The Individual Defendants Cause LHC to Systematically Target the New Medicare "Bonus" Thresholds Implemented in 2008

57.    LHC's improper practices continued when CMS adopted and implemented the 2008 change.  LHC even began planning to revamp its protocols months before the changes were implemented.  For example, a September 21, 2007 email from Liz Starr to Stelly, with the subject line "Thoughts on PPS changes," proposed (among other things) the "[d]evelopment of new therapy programs that will now be VERY financially sound but would not have been in the past

PPS reimbursement program."  *See* Finance Committee Report, at pp. 22, 621-25.  The next day, Stelly responded: "You are hitting on all cylinders right now! I really need to sit with you and tap your brain.  I think you will be an integral part of this education process going forward."  *Id*.

58.     The Company's policy of manipulating patient care to target the 6-, 14-, and 20- visit thresholds is reflected in a January 18, 2008 email to Begnaud from Elizabeth Weldon ("Weldon"), in which Weldon stated: "Different nurses that heard the in-service yesterday said that we are to do no more than 6 PT visits.  I was under the impression from the meeting and reading the regs that you got more reimbursement for increased visits.  I need to know ASAP the answer because if we are to stop at 6 we are definitely doing things wrong...."  *See* Finance Committee Report, at pp. 23, 629-31.  That same day, Begnaud responded to Weldon: "We want to do more therapy visits.  The point was made by Johnny that we still see our agencies doing only 10- 12 visits, when in fact some of these patients we could be doing 14-20 visits if needed.  They misunderstood what was being said....  Please make sure that all staff understand this."  *Id*.

59.     Later, in a January 30, 2008 email from defendant Goodman to LHC's Market Developer Patty Stonecypher and Begnaud, copying Division Vice President Chris Stagg, former Vice President, Risk Management & Education Kendra Case, and Marketing Coordinator Jenny Minvielle, Goodman wrote: "Most of our program (low vision, Pelvic Floor) called for 10 visits because it was at that threshold that we actually made additional revenue for therapy.... We get no additional revenue until we hit 6 visits."  *See* Finance Committee Report, at pp. 21, 606-12.

60.     Indeed, LHC's improper billing policies emanated from the very top of the organization.  In an April 4, 2008 email from Myers to Kevin Cragar, copying area sales managers, Scott Tobey, Stelly, George Wyatt, Jessica VanBuskirk, and state directors, Myers wrote about the need to increase therapy visits to increase revenue:

> It's all in the therapy Kevin. Episodes in the 0-5 therapy buckets have been hit the worst. We have over 70% of episodes in the 0-5 bucket since January 1, 2008. We are looking at freestanding agencies in business development that are doing much better than we are with regard to 2008 case mix and most of them actually have a pick up under the new rule. The key is that they have less than 50% of their episodes in the 0-5

16

therapy buckets. We took a financial hit for any therapy provide [sic] below 10 visits in the past, but under the new system an episode with 6 therapy visits is better than episode [sic] with 0-5 therapy visits. The new '10 visit threshold' is actually 6 visits on the low side and 20 visits on the high side. In other words, once you get to 6 visits, the more therapy visits provided the better, up to 20 visits. We need to move episodes out of the 0-5 buckets and up to the 6 and 7-9 buckets on the low end, and look for higher therapy need cases on the high end.

I think our sales people should be working closely with operations to recruit and employee more PT's, PTA's, OT's and COTA's. Sales incentives are driven by admission X case mix, and the only way to get case mix up is to increase therapy utilization. We need to look for opportunity especially within the OT area, i.e. low vision, etc.

Take a look at the chart below. This shows you how much of an impact therapy has on case mix, and case mix is what determines revenue.

| Total Therapy Visits | Average Case Mix | % of All Episodes |
|---|---|---|
| 20+ | 3.05 | 2.6% |
| 18-19 | 2.36 | 1.3% |
| 16-17 | 2.22 | 3.1% |
| 14-15 | 2.08 | 7.4% |
| 11-13 | 1.77 | 6.1% |
| 10 | 1.60 | 2.9% |
| 7-9 | 1.38 | 4.1% |
| 6 | 1.17 | 2.2% |
| 0-5 | 0.86 | 70.4% |

See Finance Committee Report, at pp. 22-23, 626-27.

61.    Given this focus and directive from the top of the Company's organization, it is perhaps not surprising that Company management also advocated a Company policy of increasing the number of therapy visits, regardless of medical necessity.  According to an April 2, 2008 email from Begnaud to Pam Wiggleworth, Stelly specifically held a conference call to impress the urgency of the Company's health care providers boosting the number of their therapy visits:

Basically the call was one to stress the urgency of the problem with LUPAs and downgrades, and also the need for our DONs to communicate with the therapists the problems with projecting visits and not completing them. The therapist also need to look at increasing the number of therapy visits and not completing them. The therapist also need to look at increasing the number of therapy visits if warranted to move these patients into the higher therapy buckets. In looking at all 2008 episodes, the company has a 10% LUPA rate and a 10% therapy downgrade rate for a

> 20% adjustment rate. Don has asked for us to have all hands on deck to look at all open episodes. He also asked that all DONs and BMs report to the state directors weekly on the number of LUPAs and downgrades. The last thing that he requested was that by the end of this week, all DONs and BMs call all of the therapists that do work for them to re-educate them on the final rule and to stress the urgency of not having the downgrades, and the need to really provide the amount of therapy visits necessary to move those patients into the higher buckets. Presently on our RAP claims, 47% of our therapy patients are receiving 0-5 therapy visits. This cannot continue to happen and the therapists need to get back with the agency asap after evaluation to let them know how many therapy visits they will be doing.

See Finance Committee Report, at pp. 23-24, 635-36.

62.    This message appears to have been received and reverberated throughout the organization.  For example, Susan Sylvester, a nurse administrator in Tennessee, wrote to branch managers Deborah Kirkland, Pam Harris and Kim Bradberry in an April 8, 2008 email:

> When speaking with your therapists about downcodes, please discuss front loading of visits. It appears that many of the patients begin to improve and decide to refuse the remainder of their therapy, go to outpatient, or are rehospitalized. The more therapy visits we've gotten in before that happens, the better off we are, as well as the patient. Obviously, our goal is to improve the patient's overall condition and functionality, however if are providing 5 therapy visits or less, we have incurred all of the expense of the therapy without any of the reimbursement. If the visits are frontloaded, ie 3w4, 2w4, 1w1, we may be able to get in enough visits early enough to complete (or nearly complete) our plan of care....
>
> I realize there have been many discussions/emails about downcodes, LUPA's and therapy utilization over the past week or so. This is a MAJOR push for Sr. Management at this time, as well as for all of us, in order to continue to operate successfully.

See Finance Committee Report, at pp. 24, 643-45.

63.    One of the branch managers, Pam Harris, responded to Susan Sylvester in an email that same day, regarding a discussion she had with a fellow therapist who "agrees to frontloading as well as going back after a couple of week [sic] to see if patients are following their exercise program or are functionally declining, in an attempt to raise the number of visits." Id.

64.    Similarly, in an April 18, 2008 email, Kim Bradberry, a Company nurse administrator, encouraged staff to attend a web seminar, stating: "In looking at SVP tools for each

W TN office yesterday, the greatest % of visits are in the dreaded 0-5 bucket for each office.  Let's all make a point of attending to this, so that we can get the higher paying buckets FULL...we want to be able to say our '20+ buckets runneth over.'"  *See* Finance Committee Report, at pp. 24, 639-42.

65.     The documents appended to the Finance Committee Report also show that other Company offices complied with the initiative to systematically target and trigger the 6-, 14-, and 20-visit thresholds.  In an October 20, 2008 email from Melissa Ayers, a branch manager at the West Virginia agency, Ayers wrote: "We have new staff RN's, which now has [sic] an understanding of the case mix and Oasis.  Kelly now has an understanding of the therapy buckets.  He now places his patient's [sic] in 6, 10, or 14 visit ranges."  *See* Finance Committee Report, at pp. 25, 646-48.

66.     LHC's focus on the bonus-triggering thresholds continued into 2009, again with attention from the very top of the Company's organization.  In a May 29, 2009 email from Myers to health care executives at other companies including Anthony Strange, CEO and Chairman of Gentiva Health Services Inc., Myers wrote: "I think we can safely say that higher therapy utilization results in higher absolute margins and higher margins as a percentage of revenue under the current case mix weights."  *See* Finance Committee Report, at pp. 29, 661-64.  Myers' May 29, 2009 email was based on and attached the following chart, which analyzed the financial impact of the 2008 Medicare payment changes instituted by CMS:

| No. Therapy Visits | Average Reimbursement | Average Cost | Average Margin Per Episode | Average % Margin Per Episode |
|---|---|---|---|---|
| 0-5 | $1900.00 | $1521.00 | $378.53 | 19.93% |
| 6 | $2617.00 | $2084.00 | $532.31 | 20.34% |
| 7-9 | $3057.00 | $2377.00 | $680.67 | 22.26% |
| 10 | $3493.00 | $2671.00 | $821.41 | 23.52% |
| 11.13 | $3831.00 | $2944.00 | $886.35 | 23.14% |
| 14.15 | $4418.00 | $3183.00 | $1234.22 | 27.94% |
| 16-17 | $4725.00 | $3424.00 | $1301.50 | 27.54% |
| 18-19 | $5091.00 | $3767.00 | $1324.02 | 26.01% |
| 20+ | $6540.00 | $4648.00 | $1892.47 | 28.94% |

67.    Later that same year, in a July 8, 2009 email from LHC employee Katy LaBauve to LHC employee Kimberly Gordon, LaBauve directed: "You have 20% in the 7-9 therapy bucket range.  Please get with therapists and have them reveal those to see if any can or need to be bumped up please."  *See* Finance Committee Report, at pp. 25, 649-50.  Similarly, Lana Smith, LHC's Kentucky State Director of Operations questioned Carolyn Cole in an October 22, 2009 email: "Considerations to get more profitable: Would you be able to increase therapy utilization in improve case mix and Op Margin? [sic] Both of these would improved [sic] financials."  *See* Finance Committee Report, at pp. 24, 637-38.

68.    Company managers also specifically discussed maximizing revenue by triggering the 6-, 14-, and 20-visit thresholds.  For example, in a December 2, 2009 email from LHC Division Vice President Ammy Lee to an LHC branch manager Jeannie Duckett, stated: "I see 19 patients in the 12-14 therapy bucket.  Were you aware that there is an 18% difference in revenue between this bucket and the next highest one (15-16)?"  *See* Finance Committee Report, at pp. 25, 651-55.

### The Individual Defendants' False and Misleading Statements Concerning the Company's Revenue, Internal Controls, and Compliance Initiatives

69.    Since at least 2008, the Individual Defendants have knowingly caused the Company to disseminate false or materially misleading statements to its stockholders and the investing public. Specifically, the Individual Defendants caused the Company to tout and champion LHC's "strong" and "outstanding" revenues and profits, while knowing that these numbers were based on the Company's improper and illegal manipulation of the Medicare reimbursement system.

70.    For example, on May 1, 2008, Myers, Roman and Indest participated in a conference call to discuss the Company's first quarter 2008 results.  During the call, Indest stated:

> I'd like to conclude by offering a special thanks to our operations team. In the spring and summer of 2000, our team worked diligently and prepared us well for the new homecare prospective payment system. We are blessed to have many members of this same team working with us today. Led by our Senior VP of Operations, Don Stelly, his team worked many hours to ready our company for the challenges presented with the January 1

reimbursement changes enacted by CMS. The results of their efforts have been clearly demonstrated and continue to evolve into an effective operating model.

I also say, "job well done" to all of our leaders and staff in the field. While continuing to provide the highest level of patient care, they participated in the many education sessions that were presented to them. They obviously learned their lessons well.

71.     On July 30, 2008, one or more of the Individual Defendants caused LHC to issue a press release announcing its second quarter 2008 financial results, including net income of $6.3 million and revenue of $90.1 million for the quarter ended June 30, 2008.  The July 30, 2008 press release also quotes the following comments made by Myers:

The second quarter of 2008 was a breakout quarter for the LHC Group family and the first quarter in which the Company experienced the full impact of the Medicare reimbursement changes. We also see these results as confirmation of the ability of our management team to successfully adapt to changes in the reimbursement environment. I believe our performance by every measure should be an indicator of what lies ahead. The investments we've made in our business over the past year have positioned us for a new era of expansion and growth, and we could not be more confident and more excited about the future.

72.     On July 31, 2008, the Company held a conference call to discuss its second quarter 2008 results.  During that call, Indest remarked how "this second quarter was the first true indication of how we would perform under the new reimbursement guidelines.  There was a great deal of speculation about the new rule and how LHC might be affected.  As is our custom, we studied, we evaluated and set forth a plan that would assure our success, while maintaining our focus on what drives us all at LHC, providing the highest level of service to those patients entrusted to our care."

73.     Also during the July 31, 2008 call, Myers announced that the Company was increasing its guidance for 2008, from revenue of $340-360 million to $350-370 million. Responding to a question regarding the basis for the increase, Roman stated: "This increase really more relates to what we see as being a very effective application of how we approach the final rule and how we provide our services to our patients.  And I think we're just recognizing that the

operating results were a little bit faster and a little bit better than we had originally anticipated, so I would say it's more related to operations than it is acquisitions."

74.      Further, when specifically questioned about the new reimbursement system's effect on therapy visits, Indest again touted the Company's response to the rule changes:

[Analyst]:

Okay. And then finally, my understanding is that maybe the only benefit of the new reimbursement system is that for therapy episodes, if the number of visits required by the patient increases under the new rule, you actually, in your final reimbursement, will get paid that higher amount. Whereas the way it used to work was only if the number of therapy visits increased, you wouldn't get the higher amount, but if it decreased you would get a lower amount. So it went from being as negative adjustment to a potentially balanced or positive adjustment. Are you seeing any of that positively impacting your revenue this quarter?

John Indest - President and COO

It has had some positive impact on our revenue. We continue to focus on our therapy visit and establishing the proper visiting pattern for our patients. I can tell you that one thing that we have done and we continue to work on. One of the real – one of the therapy components that was hit very hard when prospective payment came into effect on October of 2000, was speech therapy. And the reason for that was that speech therapy, almost by its very nature, is a long-term therapy.

*        *        *

And therefore providing – going out, soliciting the business for a lot of speech therapy, you're providing a great service and getting financially, really hurt financially for providing that long-term service. Under this new methodology, we're finding ways to have multiple therapies in the home, and therefore increase somewhat our therapy utilization. We're certainly working more and more on getting appropriate levels of therapy services and getting multiple disciplines in the home when they're appropriate and working with the physician. So, in my opinion, we have continued room for improvement in that area.

75.      On August 7, 2008, one or more of the Individual Defendants caused the Company to file with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2008, which included the same financial results previously reported in the Company's July 30, 2008 press release.  The Form 10-Q included the following certification by Myers:

I, Keith G. Myers, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of LHC Group, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design

23

or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

76.   The Form 10-Q also included a substantially and materially identical certification signed by Roman.

77.   On October 29, 2008, one or more of the Individual Defendants caused LHC to issue a press release reporting its third quarter 2008 financial results, announcing net income of $8 million and revenue of $98.2 million for the quarter ended September 30, 2008.  The October 29, 2008 press release also quotes the following comments made by Myers:

We are pleased to report another very strong quarter for the LHC Group family. By every measure, our third quarter results are the best in the history of our company. Our continued ability to deliver a strong return on equity was recently recognized once again when we were named #8 on the Forbes list of "America's 200 Best Small Companies." This is the second year in a row that LHC Group has made the top 10. Although we are proud of the operating results this quarter and this most recent recognition from Forbes, we are most proud of the quality of care being delivered by our dedicated caregivers to the many patients, families and communities we serve each and every day.

78.   On November 10, 2008, one or more of the Individual Defendants caused LHC to file with the SEC its Form 10-Q for the fiscal quarter ended September 30, 2008.  The Form 10-Q included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above.  The November 10, 2008 Form 10-Q also reported the same financial results announced in the Company's October 29, 2008 press release.

79.   On March 10, 2009, one or more of the Individual Defendants caused LHC to issue a press release announcing its fourth quarter and fiscal year 2008 financial results, reporting net income of $10.5 million and net revenues of $111.5 million for the quarter ended December 28, 2008.  The Company also announced reported net income of $30.2 million and net revenues

of $383.3 million for the full year ended December 28, 2008.  The March 10, 2009 press release also quotes the following comments made by Myers:

> Without question, 2008 was a great year for LHC Group, and we are well positioned for continued growth and success in the future.  As we look back on 2008 with an appropriate amount of satisfaction and congratulate our team on a job well done, we remain focused on our long-term goals and objectives.  We are constantly reevaluating and reinventing ourselves by making the necessary investments in people and technology to become even more efficient and deliver even higher quality outcomes to every patient we serve.

80.    On March 16, 2009, one or more of the Individual Defendants caused LHC to file with the SEC its Form 10-K for the fiscal year ended December 28, 2008.  The Form 10-K included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above.  The March 16, 2009 Form 10-K also reported the same financial results previously announced in the Company's March 10, 2009 press release.

81.    On May 6, 2009, one or more of the Individual Defendants caused LHC to issue a press release announcing its first quarter 2009 financial results.  The Company reported net income of $11.1 million and revenue of $124.6 million for the quarter ended March 31, 2009.  The May 6, 2009 press release also quotes the following comments made by Myers:

> We continue to be very pleased with the overall performance of our company. All credit goes to the hard working, caring and dedicated employees of the LHC Group Family.  The long-term commitment to excellence that is ingrained in our culture and in every member of our team is a key element of our continued success.  Our long-term commitment to delivering cost-effective, high-quality healthcare services to the patients, families and communities we serve is at the heart of everything we do and every decision we make.

82.    On May 8, 2009, one or more of the Individual Defendants caused LHC to file with the SEC its Form 10-Q for the fiscal quarter ended March 31, 2009.  The Form 10-Q included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above.  The May 8, 2009 Form 10-Q also reported the same results set forth in the Company's May 6, 2009 press release.

83.     On August 4, 2009, one or more of the Individual Defendants caused LHC to issue a press release announcing its financial results for the second quarter of 2009, reporting net income of $10.3 million and revenue of $132.6 million for the quarter ended June 30, 2009.  The August 4, 2009 press release also quotes the following comments made by Myers:

> We are pleased to report another fundamentally strong quarter.  All credit goes to the hard working, caring and dedicated employees of the LHC Group family. We remain focused on our long-term goals and objectives and are constantly reevaluating and reinventing ourselves by making the necessary investments in people and technology to become even more efficient and deliver even higher quality outcomes to every patient we serve.  Our long-term commitment to delivering cost-effective, high-quality healthcare services to the patients, families and communities we serve is at the heart of everything we do and every decision we make.

84.     On August 7, 2009, one or more of the Individual Defendants caused LHC to file with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2009.  The Form 10-Q included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above.  The August 7, 2009 Form 10-Q further reported the same results previously reported in the Company's August 4, 2009 press release.

85.     On October 28, 2009, one or more of the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter of 2009, reporting net income of $9.8 million and revenue of $132.5 million for the quarter ended September 30, 2009.  The October 28, 2009 press release also quotes the following comments made by Myers:

> I am extremely proud of the results produced by the entire LHC Group team during the third quarter.  Despite the constantly changing health care reform news, our team remained focused on delivering quality patient care while producing outstanding financial results.  Our team also implemented significant infrastructure initiatives in the areas of quality, technology and compliance that will prepare us for continued growth and position us to remain a leader in home care regardless of the outcome of health care reform.

86.     On November 6, 2009, one or more of the Individual Defendants caused the Company to file with the SEC its Form 10-Q for the fiscal quarter ended September 30, 2009.  The Form 10-Q included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above. The November 6, 2009 Form 10-Q also reported the same results previously reported in the Company's October 28, 2009 press release.

87.     On March 3, 2010, one or more of the Individual Defendants caused the Company to issue a press release announcing its fourth quarter and fiscal year 2009 financial results, reporting net income of $12.7 million and revenue of $141.5 million for the fiscal quarter ended January 3, 2010.  The Company also announced net income of $43.8 million and net revenues of $532.0 million for the full year ended December 31, 2010.  The March 3, 2010 press release also quotes the following comments made by Myers:

> 2009 was another great year for LHC Group.  While much of the attention in 2009 was on Washington, D.C. and health care reform, we continued to prepare ourselves for 2010 and beyond.  As we look back on 2009 with an appropriate amount of satisfaction and congratulate our team on a job well done, we remain focused on our long-term goals and objectives.  As we look forward to the next decade in our company's history, we are well positioned to take advantage of future internal and external growth opportunities and to continue our ongoing efforts to always exceed the expectations of the patients and families we serve.

88.     On March 15, 2010, one or more of the Individual Defendants caused LHC to file with the SEC its Form 10-K for the fiscal year ended December 31, 2010.  The Form 10-K included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above. The March 15, 2010 Form 10-K also reported the same financial results previously announced in the Company's March 3, 2010 press release.

89.     On April 28, 2010, one or more of the Individual Defendants caused the Company to issue a press release announcing its first quarter 2010 financial results, reporting net income of

$11.6 million and revenue of $145.9 million for the quarter ended March 31, 2010.  The April 28, 2010 press release also quotes the following comments made by Myers:

> During the first quarter of 2010, our dedicated caregivers and employees have once again exceeded expectations. I would like to congratulate and thank our entire team for their unwavering commitment to delivering the highest quality of care to the growing number of patients, families and communities we serve. With the passage of comprehensive healthcare reform during the first quarter, we now have more certainty in regards to the long term reimbursement environment. We expect a period of significant consolidation in the industry over the next several years, and we are prepared to absorb this growth both organically and through acquisitions or joint ventures.

90.    On May 7, 2010, one or more of the Individual Defendants caused the Company to file with the SEC its Form 10-Q for the fiscal quarter ended March 31, 2010.  The Form 10-Q included signed certifications by Myers and Roman, which were identical, and/or substantially and materially identical, to the certification set forth in paragraph 75 above.  The Form 10-Q also reported the same results previously reported in the Company's April 28, 2010 press release.

91.    In sum, the Individual Defendants caused the Company, through SEC filings and press releases, to attribute LHC's substantial and historic revenue growth and financial successes to "organic growth" and acquisitions.  And, through these same media releases, the Individual Defendants caused the Company to repeatedly tout its purported compliance with laws as well as the purported quality and comprehensiveness of its compliance department.

92.    The above statements were false and misleading because the Individual Defendants knew but failed to disclose that the Company was manipulating the number of home visits that patients received, regardless of whether some patients actually needed those services, to meet "bonus" thresholds and achieve higher reimbursement rates under the Medicare payment system, even when such visits were not medically necessary.

93.    Notably, on March 15, 2013, this Court denied the Company and certain of the Individual Defendants' motion to dismiss a securities class action filed against them, holding that the complaint, which alleged that these statements constituted violations of federal securities laws, "sufficiently alleges an actionable misrepresentation or omission of material fact."

## **INSIDER TRADING**

### **Defendant Myers**

94.     Myers profited greatly from his wrongdoing during the Relevant Period, through both unusual and suspicious sales of stock at inflated prices and of excessive compensation paid by the Company, consisting in large part of bonuses and incentive payments that would have been much smaller, or not have been paid at all, were it not for the fraudulent activity alleged herein.

95.     Myers' compensation for 2008 - 2011 totaled $5,478,598, of which $1,069,057 – or 20% – was attributable to non-equity incentive payments, and $2,368,854 which was due to restricted stock awards granted by the Company.

96.     Myers also benefited from unusual and suspicious sales of stock during the Relevant Period.  Having not sold any Company stock for over one year prior, Myers made twenty sales in twenty-one months during the Relevant Period, selling over 650,000 shares, for total proceeds of *$20,909,725*.  Perhaps most notably, over a three-day period from May 10, 2010 through May 12, 2010, Myers sold 175,000 shares of stock, at prices ranging from $35 to $35.13 per share, for a total amount of $6,147,885.  Myers' May 10, 2010 – May 12, 2012 stock sales represented the most shares of Company stock that Myers has ever unloaded over any three-day period.   And these sales immediately preceded the Company's receipt of a letter from the Senate Finance Committee announcing the Committee's intent to investigate the Company based on the April 26, 2010 *Wall Street Journal* article.  Indeed, the Company's May 12, 2010, after-hours press release announcing the Senate Finance Committee inquiry, indirectly confirms this timing, stating:  "…[A]t 4:37 p.m. Central Time today, the Company received a letter from the Senate Finance Committee regarding the April 26, 2010 article in the *Wall Street Journal* entitled, "Home Care Yields Medicare Bounty…."

97.     While selling over 650,000 shares of Company stock during the Relevant Period, after the end of Relevant Period (October 26, 2011), Myers would not sell a single, additional share of his Company stock until May 22, 2013 – over 18 months after the Relevant Period ended.

**Defendant Indest**

98.     Indest also benefited from unusual and suspicious sales of stock during the Relevant Period.  Having not sold any Company stock for nearly seventeen months prior, Indest made three sales in approximately a fifth-month span during the Relevant Period in 2010, selling over 60,000 shares, for total proceeds of *$1,955,430*.  One of these sales – of 20,000 shares, at a price of $34.76 per share, netting Indest $695,200, occurred only six days before the Company received the May 12, 2010 Senate Finance Committee letter.  Moreover, at the time he unloaded these 60,000 + shares, Indest remained active in the Company, as a director but also as Special Advisor to the Company's CEO Myers.

99.     While selling over 60,000 shares of Company stock during the Relevant Period, after the end of Relevant Period (October 26, 2011), Indest would not sell a single, additional share of his Company stock until late August 20112 – about 10 months after the Relevant Period ended.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT IS REVEALED**

100.     On April 26, 2010, the *Wall Street Journal* released its aforementioned article analyzing therapy utilization patterns at LHC.  The article opined that LHC (among other home health care agencies) was improperly taking advantage of the Medicare reimbursement system by providing medically unnecessary patient care solely to reach the PPS thresholds.  Specifically, the article highlighted, when the bonus threshold changed, the percentage of LHC's patients receiving 10 therapy visits dropped by a staggering 64% from 2007 to 2008.

101.     Shortly thereafter, as noted, the Senate Finance Committee launched an investigation, in connection with which it requested documents from LHC and three other home health companies relating to home therapy visits from 2006 to 2009.  In connection with announcing the investigation, Finance Committee Chairman Max Baucus (D-Mont.) stated: "Too many Americans count on Medicare to provide quality health care to allow the program to be manipulated for somebody else's profit.... Companies that work with Medicare should not be

allowed to ... adjust the way they care for patients simply to increase profits." Similarly, Finance Committee ranking member Chuck Grassley (R-Iowa) commented: "Every dollar wasted is taken away from Medicare beneficiaries.... We need to make sure care is provided based on patients' best interests, not profit margins. So far, it appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both."

102.    On May 12, 2010, one or more of the Individual Defendants caused the Company to issue a press release regarding the Senate Finance Committee's investigation. The Individual Defendants caused LHC to deny the allegations in the *Wall Street Journal* article. Instead, the Individual Defendants caused LHC to claim that the number of LHC home care therapy sessions were dictated by independent physicians, not targeted to the bonus thresholds. Further, the Individual Defendants caused LHC to attribute increased revenues to an increase in patient populations:

> The Committee has asked us to respond to some questions regarding therapy utilization in prior years, and we intend to cooperate with the request. Although our response will contain a comprehensive analysis, we wanted to take this opportunity to provide a few of the key facts that will be included in our response.
>
> - As a company, therapy represents a much lower portion of our episodes than the national average. In 2007, 36.6% of our total Medicare episodes received therapy versus the national average of 49.8%, and only 38.2% of our total Medicare episodes in 2008 received therapy versus the national average of 50.2%.
>
> - All home care services, including therapy, are dictated by an independent physician order.
>
> - The average number of therapy visits received by our top 20 patient diagnoses that required therapy in 2007, as compared to those same patient diagnoses in 2008, was consistent despite the change in therapy thresholds from 2007 to 2008. In fact, in none of those top 20 diagnoses did the average visits increase to a level that would result in our meeting or exceeding a higher therapy threshold.
>
> - The Wall Street Journal article assumes a static patient population when in fact, due to growth resulting from industry consolidation, our home health patient population on December 31, 2007, was 17,850, and on December 31, 2008, our home health patient population was 26,163, an increase of 46.6%. During this same period, our home health locations increased from 144 to 206. We also increased the

number of states in which we operated from 11 to 17. As a result of this growth, the make-up of our top 20 patient diagnoses in 2007 was very different from our top 20 patient diagnoses in 2008.

- Since 1996, we have maintained a corporate compliance program and an employee compliance hotline operated by an independent third party.

103.    In July 2010, however, despite the denials in the May 12, 2010 press release, the Company disclosed that the SEC had launched an investigation related to its Medicare reimbursement practices.  The SEC requested and ultimately subpoenaed documents related to the Company's participation in PPS, as well as the documents and information the Company produced in connection with the Finance Committee's investigation.

104.    In a July 13, 2010 press release announcing the SEC investigation, one or more of the Individual Defendants continued to cause the Company to deny the allegations in the *Wall Street Journal* article.  Instead, the Individual Defendants caused the Company to claim that LHC's therapy visits were based on patient needs as opposed to maximizing Medicare reimbursement. Specifically, Myers claimed: "Since our inception, we have maintained a clinically driven, decentralized operating model and company culture that promotes the provision of care centered on the needs of the patients we serve.  In our response to the SEC, we intend to demonstrate this commitment to patient-centered care and our commitment to compliance and program integrity."

105.    On October 3, 2011, however, the Senate Finance Committee published the Finance Committee Report, which concluded that LHC encouraged its therapists to target the most profitable number of therapy visits even when patient need may not have justified such visits.  The Company also concentrated numbers of therapy visits at or just above the point at which a "bonus" payment was triggered for prospective payments.  Finance Committee Chairman Max Baucus responded that "[t]he gaming of Medicare" by LHC and other companies "represents serious abuse of the home health program."

106.    Indeed, as shown herein, internal documents demonstrate that the Individual Defendants knew or with the exercise of any reasonable amount of diligence should have known of the Company's improper targeting and billing practices, yet willingly approved these practices

to boost Company revenue.   Specifically, documents reveal, among other things, that the Individual Defendants developed a competitive ranking system aimed at driving therapy visits towards profitable thresholds, and further that LHC management regularly discussed increasing therapy visits and expanding specialty programs to increase revenue.  The Finance Committee Report harshly declared that such practices at best "represent abuses" of Medicare and at worst "may be examples of for-profit companies defrauding the program at taxpayer's expense."

107.   The Individual Defendants, rather than acknowledging that the Company's reported revenue was unsustainable because it was based on the improper practices of manipulating the number of home health visits to reach Medicare threshold levels, concealed their knowledge regarding the Company's improper practices and instead issued false and misleading statements regarding the Company's financial condition and future prospects.   As a result, the Company has incurred costs and expenses in connection with the SEC and the Finance Committee investigations, and other damages associated with the Company's illegal conduct.

## QUI TAM ACTIONS AND OTHER INVESTIGATIONS PUT THE INDIVIDUAL DEFENDANTS ON NOTICE OF THE COMPANY'S IMPROPER PRACTICES

108.   The Company's improper and illegal manipulation of the Medicare reimbursement program was also the subject of at least two qui tam actions and additional governmental investigations initiated before the *Wall Street Journal* article was published.  These lawsuits and investigations collectively put the Individual Defendants on notice of the serious problems with the Company's home health care Medicare reimbursement program and strategies, yet they failed to take corrective action, and instead allowed the Company to continue to violate the law.

109.   On March 20, 2009, a former LHC therapist filed a qui tam complaint against the Company entitled: *United States ex rel. Summers v. LHC Group, Inc.* ("*Summers*"), No. 3:09-cv00277, in the United States District Court for the Middle District of Tennessee.  The action was ultimately dismissed for failure to comply with certain required procedures for qui tam

actions. But the allegations in the relator's original and amended complaints are consistent with the findings of the Finance Committee Report.

110.    Specifically, the relator alleged that, during summer 2008, when she worked as a Company therapist, that supervisors directed therapists to "conduct more home and therapy visits to patients" and that such visits were mandated "regardless of whether they were needed or not. Medicare was routinely billed for visits that were not needed."

111.    In July 2009, not long after the *Summers* action was filed, the Company learned that it was under investigation by the Department of Health and Human Services Office of Inspector General ("OIG") relating to services provided by the Company to Medicare beneficiaries. The OIG investigation was spawned by another qui tam action filed against the Company in 2007 in the United States District Court for the Western District of Louisiana entitled: *United States ex rel. Master v. LHC Group, Inc.*, No. 6:07-cv-01117.  The relator there was a registered nurse who conducted Medicare compliance audits at LHC's facilities.  She alleged that the Company knowingly submitted claims for reimbursement from Medicare that were false and fraudulent because they were for services that were not medically necessary nor ordered by physicians.

112.    On September 30, 2011, the Company announced that it had reached an agreement to settle the Master qui tam action and related governmental investigations relating to its billing practices for home health services including skilled nursing visits, therapy visits and home health aide visits from 2006 to 2008.  The Company agreed to pay a $65 million fine and enter into a Corporate Integrity Agreement with the OIG.

113.    Just days later, the Finance Committee Report was issued, revealing the depths to which LHC's unlawful practices went, and also disturbingly revealing that the Company's manipulation of the number of therapy visits provided to patients to meet Medicare "bonus" thresholds had continued even after the period covered by the settlement that LHC announced on September 30, 2011.

## THE FRAUDULENT STOCK REPURCHASES

114.    While the Individual Defendants were making false or materially misleading and improper statements that artificially inflated the Company's stock price, the Director Defendants directed or permitted the Company to overpay for its own stock through significant stock repurchases.  The Director Defendants facilitated and allowed the Company to repurchase its shares at inflated prices by authorizing a $50 million stock buy-back program.  The Director Defendants knew or recklessly disregarded the fact that the Company's stock price was artificially inflated due to the false or materially misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.  Myers, as LHC's top executive, was ultimately responsible for the Company's repurchases.  Despite knowing that the Company's stock was inflated due to his own and others' improper and misleading statements, Myers directed or permitted the repurchase of $577,000 of the Company's stock.

115.    In particular, on or about October 29, 2010, the Director Defendants authorized the Company to repurchase $50 million of its own stock.  Further, the Board permitted the Company to repurchase over 24,159 shares at a cost of $577,000 from June 1, 2011 through June 30, 2011. The Director Defendants caused the Company to make these repurchases well after both the SEC and Senate Finance Committee had initiated investigations into LHC's home health care Medicare billing practices, and only three to four months before the Senate Finance Committee issued the Finance Committee Report that caused a 12% decline in the value of the Company's stock.

116.    The Director Defendants knew, or recklessly disregarded that the Company's share price was inflated due to the false or materially misleading statements described herein regarding the nature and source of the Company's revenue and revenue growth, the Company's purported compliance with applicable laws, and the purported comprehensiveness and effectiveness of the Company's internal controls and compliance protocols.  Nevertheless, the Director Defendants allowed the Company to deplete its assets by paying large premiums to repurchase its own stock,

despite knowing (or recklessly disregarding) that the exposure of these false or materially misleading statements would cause the Company's stock price to drop significantly.

117.    Specifically, under the Director Defendants' direction, the Company bought back its shares at a weighted average price of $23.93 per share, substantially higher than LHC's share price of $15.01 on October 4, 2011, after the Senate Finance Committee issued the Finance Committee Report.  The Company thus incurred real economic loss from the shares it repurchased at inflated prices during the Relevant Period.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

118.    By reason of their positions as officers, directors, and/or fiduciaries of LHC and because of their ability to control the business and corporate affairs of LHC, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LHC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of LHC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

119.    Each director and officer of the Company owes to LHC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

## Audit Committee Duties

120.     In addition to their duties as members of the Board, the members of the Audit Committee owed specific duties to LHC under the Audit Committee's Charter, including the duties to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over SEC and financial reporting.

121.     Under the Audit Committee's Charter, the members of the Audit Committee were required to "assist the Board in fulfilling its financial and other oversight responsibilities" regarding: (i) "the integrity of the Company's financial statements and other financial information, financial reporting process, internal controls and procedures for financial reporting, and disclosure controls and procedures; (ii) the "Company's ethical and legal compliance related to accounting and auditing matters"; and (iii) the "Company's internal control structure."

122.     The specific duties of the Audit Committee in furtherance of these goals included (among other duties):

> **1.      Review of Financial Statements, Reports and Charter.** The Committee shall review the Company's financial statements, reports and other financial information, in conjunction with the Company's financial management and independent registered public accounting firm, as appropriate. Such review shall include candid discussions of the quality and not merely the acceptability of the Company's accounting principles as applied in its financial reporting. Reviews shall occur prior to dissemination of the statement, report or other document to a third party or the public. Without limitation, the Committee shall review, to the extent it deems necessary or appropriate:
>
>> a.      The annual financial statements and other material financial content of the Company's Annual Report to Stockholders and Annual Reports on Form 10-K, including any certification, report, opinion, attestation or review rendered by the independent registered public accounting firm;
>>
>> b.      Any quarterly or other interim financial statements and other material financial content of the Company's Quarterly Reports on Form 10-Q, including any certification, report, opinion, or

review rendered by the independent registered public accounting firm;

c.    Any other material financial information, such as earnings releases or financial information and earnings guidance provided to analysts, lenders or rating agencies, including, without limitation, the use of "pro forma" or "adjusted" non-GAAP information. In lieu of reviewing each such disclosure prior to release or dissemination, the Committee may discuss generally with management the types of information to be disclosed and the types of presentations to be made; and

d.    Any material internal reports related to the Company's financial management prepared by the Company's independent registered public accounting firm, internal auditors or management.

\*       \*       \*

3.    **Financial Reporting and Auditing Processes**. The Committee's and the Board's relationship with the Company's management, including its financial management, shall be governed by the following principles:

a.    The Committee shall oversee the integrity of the Company's financial reporting process;

b.    The Committee shall discuss with the independent registered public accounting firm and management the overall scope and plans for the annual audit;

c.    The Committee shall review with the independent registered public accounting firm, internal audit and management the adequacy and effectiveness of the Company's internal controls and procedures for financial reporting, including management's report on the adequacy or effectiveness of internal controls; any material adjustments proposed by the independent registered public accounting firm and immaterial adjustments not recorded; disclosure controls and procedures; and the fullness and accuracy of the Company's financial statements. The Committee shall consider the quality of presentation of, among other matters, critical accounting policies, off-balance sheet transactions and financial measures presented on a basis other than in accordance with generally accepted accounting principles;

d.    The Committee shall review the quality and appropriateness of the Company's accounting principles and underlying estimates as applied in its financial reporting, including the independent registered public accounting firm's judgments concerning the foregoing;

e.   The Committee shall oversee the process of documentation, assessment and testing of internal controls performed pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 by management, the Internal Audit Department, the Company's independent registered public accounting firm and other consultants;

f.   In consultation with the independent registered public accounting firm, the internal auditors and management, the Committee shall review any major changes or improvements to the Company's financial and accounting principles and practices, internal controls and procedures for financial reporting and disclosure controls and procedures;

g.   The Committee may, as it deems necessary or advisable, discuss policies with management with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures; and

h.   The Committee shall obtain assurance from its independent registered public accounting firm that Section 10A(b) of the Exchange Act (required responses to audit discoveries) has not been implicated.

### 4.   Oversight of Internal Audit Function.

a.   The Committee shall review the appointment and replacement of the senior internal auditing executive;

b.   The Committee shall review the significant reports to management prepared by the internal auditing department and management's responses; and

c.   The Committee shall discuss with the independent registered public accounting firm and management the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.

### 5.   Ethical and Legal Compliance.

a.   The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

b.   [….]

c.   The Committee shall also:

i.   Meet periodically with the Chief Compliance Officer for

a report on the Company's Corporate Compliance Program, including a review of any issues that may affect in any material way the financial reporting process, the financial or enterprise risks of the Company and internal control systems of the Company.

ii.    Receive and review periodic reports from the Chief Compliance Officer regarding, among other things: (i) compliance-related activities undertaken by the Company; (ii) the results of material compliance audits conducted; (iii) reports on on-going compliance training programs; (iv) calls received by the Company's anonymous hotline, and the investigation and resolution of those matters; (v) the effectiveness of the Company's Code of Conduct and Ethics, and (vi) other complaints and allegations relating to the Company's compliance matters.

iii.   Review with the Company's Chief Compliance Officer and financial and other personnel, the adequacy and effectiveness of the Company's internal regulatory, corporate compliance and risk management controls.

       …. [and]

vi.    Review with the Company's General Counsel as necessary legal matters that may have a material impact on the Company's compliance status and any material inquiries or reports from regulators or governmental agencies….

### Clinical Quality Committee Duties

123.    Under the Clinical Quality Committee Charter, the members of the Clinical Quality Committee were tasked "to assist the Board in the discharge of its responsibilities with respect to maintaining a culture of clinical safety and quality care throughout the Company, and to "provide oversight to the Company's efforts in measuring, disseminating and improving of clinical practices, with the goals of sustaining leadership in, and setting best practices for, the health care industry." In furtherance of these duties, the Clinical Quality Committee members were required to, *inter alia*:

• Monitor the Company's performance on established internal and external

40

benchmarking regarding clinical performance and outcomes;

- Oversee and evaluate the effectiveness of the Company's performance improvement and quality plans;

- Facilitate the development of industry best-practices based on internal and external data comparisons;

- Foster enhanced awareness of the Company's clinical performance by the Board and appropriate external sources;

- Establish a long term, strategic clinical vision for the Company; [and]

- Make recommendations to the Board with respect to the Company's overall quality, safety, and performance improvement initiatives….

### The Company's Code of Conduct and Ethics

124.    The Individual Defendants were also bound by LHC's "Code of Conduct and Ethics, a Guide to Conduct at LHC Group, Inc." ("Code of Conduct").  The Code of Conduct applies to all employees of the Company, as well as the Company's officers and directors.  The Code of Conduct describes the Company's "mission" as to "ensure we meet our ethical standards and comply with applicable laws and regulations…."

125.    The Code of Conduct further describes the Company's Corporate Compliance Program, and states how "[t]he adoption and implementation of this program significantly advance the prevention of fraud, abuse and waste in our healthcare efforts and further our fundamental mission to provide quality care to patients."  Further, the Code of Conduct states, "[i]t is the responsibility of each individual to be aware of all policies and procedures that pertain to his or her work and to follow those policies and procedures."

126.    Regarding training, the Code of Conduct provides: "Upon hire, each employee is required to participate in compliance training and to confirm that he or she has completed this training, has read and understands this Code, and that he or she understands that compliance with this Code is required during employment…."

127.    Further, regarding coding and billing, the Code of Conduct states, in pertinent part:

> We have implemented policies, procedures and systems to facilitate accurate billing to government payers, commercial insurance payers and patients.  These policies, procedures and systems conform to pertinent federal and state laws and regulations.
>
> We prohibit any employee or agent of LHC Group from knowingly presenting, or causing to be presented, claims for payment or approval which are false, fictitious or fraudulent.  In support of accurate billing, medical records must provide reliable documentation of the services we render.  It is important that all individuals who contribute to medical records provide accurate information and do not destroy any information considered part of the official medical record.  Accurate and timely documentation also depends on the diligence and attention of physicians who treat patients in our facilities.  We expect those physicians to provide us with complete and accurate information in a timely manner.
>
> Only ***bill for services that are medically necessary and properly ordered and performed.***

128.   And, purportedly in answer to a hypothetical question regarding coding, the Code of Conduct states:  "It is imperative that the OASIS assessments be completed as accurately as possible to reflect a patient's functional status, which may require an interdisciplinary team approach at times.  The OASIS assessment scores dictate reimbursement rates with the Medicare program and accuracy is imperative to ensure compliance with the False Claims Act and other pertinent billing laws and regulations."

129.   Finally, in the "Laws and Regulations" section, the Code of Conduct states, in relevant part:

> Healthcare is a unique industry with rigorous standards and special regulations.  In the United States, healthcare laws seek to:
>
> - reduce fraud, waste and abuse in federal healthcare programs;
> - eliminate the improper influence of financial incentive on medical judgment;
> - protect patients and improve the quality of healthcare;
> - reduce the cost of healthcare; and
> - ensure proper use of taxpayer money.
>
> Anyone aware of violations or suspected violations of laws, regulations, standards and the Conditions of Participation, or company policies and

procedures must report them immediately to a supervisor or member of management, the Chief Compliance Officer or IntegrityLine.

**Fraud and Abuse**

We expect our employees to refrain from conduct that may violate federal and state laws governing patient referrals, healthcare financial relationships and participation in federal and state healthcare benefit programs. Fraudulent activity may involve material false statements or representations of facts in order to obtain payment or other benefit.  Abuse may be practices that result in unnecessary increased costs or utilization of medical services/products….

## CONTROL, ACCESS, AND AUTHORITY

130.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of LHC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LHC.

131.    Because of their advisory, executive, managerial, and directorial positions with LHC, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of LHC.

132.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LHC, and was at all times acting within the course and scope of such agency.

## REASONABLE AND PRUDENT SUPERVISION

133.    To discharge their duties, the officers and directors of LHC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of LHC were required to, among other things:

(a)      refrain from acting upon material inside corporate information to benefit themselves;

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)      remain informed as to how LHC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)      ensure that LHC was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

134.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to LHC and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of LHC, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LHC, the absence of good faith on their part, and a reckless disregard

of their duties to LHC and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to LHC.

135.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that LHC's revenues and revenue growth from its home care segment were legitimately derived and the result of organic growth, when in fact the Company's revenues and revenue growth were derived in substantial part from the Individual Defendants' systematic efforts to abuse and defraud the Medicare home health care program by causing LHC to manipulate the number of home visits that patients received, irrespective of patient need.

136.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.  As a result, LHC has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' and Company's wrongdoing.

## CONSPIRING, AIDING AND ABETTING, AND CONCERTED ACTION

137.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

138.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that misled shareholders about the accuracy of the Company's statements that were made in public filings with the SEC, press releases, and at major investor conferences and presentations concerning the source and legitimacy of LHC's home care revenues and revenue growth, and concerning the adequacy of the Company's internal controls purportedly designed to prevent the very type of Medicare fraud and manipulation that occurred.

In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

139.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

140.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

141.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **DAMAGES TO LHC**

142.    As a result of the Individual Defendants' wrongful conduct, LHC disseminated false and misleading statements, which have devastated LHC's credibility.  Additionally, LHC is now the subject of a securities fraud class action lawsuit.  The Company will face substantial costs in connection with an investigation and the lawsuit.

143.    As a direct and proximate result of the Individual Defendants' actions as alleged above, LHC's market capitalization has been substantially damaged.

144.    Further, as a direct and proximate result of the Individual Defendants' conduct, LHC has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

> (a)  costs incurred in investigating and defending LHC and certain officers in a class action lawsuit, plus potentially millions or billions of dollars in settlement or to satisfy an adverse judgment;
>
> (b)  costs incurred from compensation and benefits paid to the Individual Defendants, which compensation, at least with respect to the officers, was based at least in part on LHC's artificially-inflated stock price;
>
> (c)  costs incurred from the misappropriation of Company information by the Individual Defendants for the purposes of selling LHC common stock at artificially inflated prices;
>
> (d)  costs incurred from the Company buying back shares $577,000 worth of shares of Company stock at prices inflated through the Individual Defendants' misconduct; and
>
> (e)  costs incurred from the loss of the Company's customers' confidence in LHC's products and services.

145.    Moreover, these actions have irreparably damaged LHC's corporate image and goodwill.  For at least the foreseeable future, LHC will suffer from a "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that LHC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff brings this action derivatively in the right and for the benefit of LHC to redress injuries suffered, and to be suffered, by LHC as a direct result of the Individual Defendants'

breaches of fiduciary duty and unjust enrichment, as well as aiding and abetting thereof.  LHC is named as a nominal defendant solely in a derivative capacity.

147.    Plaintiff will adequately and fairly represent LHC's interests in enforcing and prosecuting its rights.

148.    Plaintiff purchased here shareholders of LHC common stock before the Relevant Period, continuously held shares of LHC common stock throughout the Relevant Period, and h**as** been a shareholder of LHC continuously since.

149.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

150.    The Board of LHC currently consists of the following eleven directors: Myers, Tauzin, Azare, Breaux, Hoyt, Indest, Lewis, Nixon, Christopher S. Shackelton (who joined the Board in 2012, after the Relevant Period), Thorpe, and Wilford.

## The Director Defendants Face a Substantial Likelihood of Liability

151.    Director Defendants Myers, Tauzin, Azare, Breaux, Hoyt, Indest, Lewis, Nixon, Thorpe, and Wilford face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period (or, in defendant Thorpe's case, for a substantial and material portion of the Relevant Period), and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements and presentations on behalf of the Company concerning the source and legitimacy of the Company's home care revenues and revenue growth, and concerning the purported adequacy of the Company's internal controls and compliance protocols designed to insure against Medicare fraud or manipulation – were true and not materially misleading.  Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members and/or Clinical Quality Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls

and/or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Clinical Quality Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

152.    Further, the Director Defendants failed to discharge their duties to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Nominating and Clinical Quality Committee's duties were being discharged in good faith and with the required diligence and due care. This authorization of false and/or misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and/or failure to take necessary and appropriate steps to ensure that the Audit Committee's and Clinical Quality Committee's duties were being discharged in good faith and with the required diligence, constitutes a breach of fiduciary duty, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of LHC to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile.

## Demand is Futile as to the Audit Committee Defendants

153.    Defendants Hoyt, Lewis, and Nixon, as Audit Committee members during the Relevant Period, were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, and for overseeing LHC's internal controls over financial

reporting.   Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance.   Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.   Any demand upon the Audit Committee Defendants therefore is futile.

## Demand is Futile as to the Clinical Quality Committee Defendants

154.    Defendants Azare, Indest, Thorpe, and Wilford, as Clinical Quality Committee members during the Relevant Period, were responsible for, among other responsibilities: (a) monitoring the Company's performance on established internal and external benchmarking regarding clinical performance and outcomes; (b) overseeing and evaluating the effectiveness of the Company's performance improvement and quality plans; (c) facilitating the development of industry best-practices based on internal and external data comparisons; fostering enhanced awareness of the Company's clinical performance by the Board and external sources; and (e) establishing a long-term, strategic vision for the Company.

155.    Despite their aforementioned duties as members of the Clinical Quality Committee, the Clinical Quality Committee Defendants failed to exercise due diligence and reasonable care in discharging their duties because they knew, or with the exercise of any reasonable due diligence reasonably should have known, that the Company's home care clinical performance revenues and growth was improperly inflated because they were based on the improper Medicare manipulation practices described herein.  The Clinical Quality Committee Defendants, however, made no effort to correct the problems or take any actions or steps to halt those problems or prevent their reoccurrence.   Accordingly, the Clinical Quality Committee Defendants face a sufficiently

substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Clinical Quality Committee Defendants therefore is futile.

### Demand is Also Futile as to Defendants Indest, Breaux, Tauzin, and Azare Because Each Director Lacks Independence

156.    Indest    currently    serves    as    Special    Advisor    to    the    CEO and as a director of the Company, and previously served as LHC's President from September 2007 to August 2009 and COO from 2005 to June 2009. Indeed, the Company admits in its proxy statement filed April 29, 2011 that Indest is not independent.  The compensation that Indest received as President and COO was material to him, and his current employment with the Company renders him incapable of independently considering a demand.

157.    Breaux currently serves as Senior Counsel of Patton Boggs LLP.  Patton Boggs LLP, in turn, provides consulting services to the Company. The Company's material financial relationship with Patton Boggs LLP and Breaux renders Breaux incapable of independently considering a demand.

158.    Tauzin currently serves as Special Legislative Counsel of Alston & Bird.  Alston & Bird, in turn, provides legal and policy related services to the Company.  The Company's material financial relationship with Alston & Bird and Tauzin renders Tauzin incapable of independently considering a demand.

159.    Azare previously served as Chief Counsel to Tauzin when he served as Chairman of the House Committee on Energy and Commerce.  Azare's long-time friendship and business relationship with Tauzin renders her incapable of independently considering a demand.

### Demand is Futile as to Defendant Myers for Additional Reasons

160.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Myers because Myers is not an independent director.

Moreover, having not sold any Company stock for over one year prior, Myers made twenty sales in twenty-one months during the Relevant Period, selling over 650,000 shares, for total proceeds of **$20,909,725**, while during this same period, Myers made, or caused others to make, false and misleading statements concerning the Company's home health revenues and revenue growth and about the purported adequacy of the company's internal controls and compliance measures, which caused the Company's stock to remain at grossly artificially inflated prices.  Accordingly, for these additional reasons, Myers faces a sufficiently substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith.  Any demand upon Myers therefore is futile.

161.    Myers also cannot disinterestedly consider a demand to bring suit against himself because Myers is a named defendant in at least one related securities fraud class action alleging that he made many of the same misstatements described above in violation of the federal securities laws.  Thus, if Myers were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the related securities action and would expose himself to liability in this action.  This he will not do.

162.    Demand is futile for the additional reason that Myers is an employee of the Company who derives substantially all of his income from his employment with LHC.  As such, he cannot independently consider any demand to sue himself for breaching his fiduciary duties to LHC, because that would expose him to liability and threaten his livelihood.

### Demand is Futile as to Defendant Indest for Additional Reasons

163.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Indest because Indest faces a substantial likelihood of liability for insider trading.  Having not sold any Company stock for over seventeen months prior, Indest made three substantial sales in 2010 over a five-month span during the Relevant Period, selling over 60,000 shares, for total proceeds of **$1,955,430**, while during this same period, Indest made, or caused others to make, false and misleading statements concerning the Company's home health

revenues and revenue growth and about the purported adequacy of the Company's internal controls and compliance measures, which caused the Company's stock to remain at highly artificially inflated prices. Accordingly, for these additional reasons, Indest faces a sufficiently substantial likelihood of liability for breach of his fiduciary duties of loyalty and good faith. Any demand upon Indest therefore is futile.

### **Demand is Futile as to All Director Defendants for Additional Reasons**

164. If LHC's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by LHC against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of LHC, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

165. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting LHC by prosecuting this action. Therefore, demand on LHC and its Board is futile and is excused.

166. LHC has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits

against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I
### *Against the Individual Defendants*
### *for Breach of Fiduciary Duties*

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    The Individual Defendants owed and owe LHC fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe LHC the highest obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

170.    The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, LHC has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.    Plaintiff, on behalf of LHC, has no adequate remedy at law.

## COUNT II
### *Against the Individual Defendants*
### *for Unjust Enrichment*

173.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of LHC.

175.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to LHC.

176.   Plaintiff, as a shareholder and representative of LHC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

177.   Plaintiff, on behalf of LHC, has no adequate remedy at law.

## COUNT III
### *Against Defendant Myers for Violation of Section 10(b) of the Exchange Act and SEC Rule*
### *10b-5 Promulgated Thereunder*

178.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.   Myers made and caused the publication of false or materially misleading statements regarding the nature and source of the Company's home care revenue and revenue growth, regarding the Company's purported compliance with applicable laws, and regarding the purported comprehensiveness and effectiveness of the Company's internal controls and compliance protocols.  Myers knew or recklessly disregarded the fact that the foregoing statements were false or materially misleading.

180.   Myers knowingly, willfully, and acting with scienter permitted and facilitated LHC's repurchase of 24,159 shares of its own shares at a cost to the Company of $577,000 when he knew that LHC's stock was substantially artificially inflated due to the false or misleading statements alleged herein.  The repurchases of LHC stock were intended to and did manipulate or deceive LHC and its shareholders.

181.   The wrongful conduct alleged herein was continuous, connected, and ongoing. Myers' misconduct resulted in continuous, connected, and ongoing harm to the Company.

182.   Myers violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that he:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon LHC stock.

183.   LHC has suffered damages by repurchasing the Company's stock at prices that Myers knew were artificially inflated as a result of the false and or materially misleading statements.  But for Myers' misconduct, the Company would not have purchased its stock at the prices it paid, or at all, if it had been aware that the market prices has been artificially and falsely inflated by the misleading statements.

## COUNT IV
### *Against the Director Defendants for Violation of Section 20(a) of the Exchange Act*

184.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.   The wrongful conduct alleged herein was continuous, connected, and ongoing during the Relevant Period, from the beginning of the Relevant Period until October 3, 2011, when

the full truth was revealed.   The Director Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

186.   The Director Defendants exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by LHC and the timing and amount of stock repurchases, and exercised their actual power and authority to control or influence one another and Myers in connection with the specific conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder as alleged above.

187.   The Audit Committee Defendants, as directors and members of the Audit Committee during the Relevant Period, exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by LHC and the timing and amount of stock repurchases, and exercised their actual power and control over Myers, as the Company's CEO, in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

188.   Each of these defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as Myers for the primary violation of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.   The Director Defendants did not act in good faith.


## COUNT V
### Against the Director Defendants for Waste of Corporate Assets

189.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.   As detailed above, the Director Defendants diverted corporate assets for improper and unnecessary purposes.   Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies expended by LHC.

191.   The Director Defendants wasted LHC's corporate assets by authorizing and effectuating the repurchase of $577,000 of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.   Causing or permitting a public company to repurchase

its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

192.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors, breaching their fiduciary duties, exposing LHC to civil liability, and causing the Company to incur potentially missions of dollars in legal costs.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

193.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

194.    Plaintiff, on behalf of LHC, has no adequate remedy at law.


**COUNT VI**
*Against Defendants Myers and Indest for Misappropriation of Information and Insider Trading*


195.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.    At the time Myers and Indest sold their LHC common stock during the Relevant Period, each was an officer, employee, and/or director of LHC, which relationships gave them access, directly or indirectly, to material information about the Company not generally available to the public.

197.     Myers and Indest sold LHC securities at a time when they knew material information about LHC – gained from their relationship with the Company – which would have significantly affected the market price of LHC common stock and was not generally available to the public.

198.    Myers and Indest knew these facts were not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of LHC common stock.

199.    Myers and Indest had knowledge of material, adverse, non-public information about LHC, misappropriated this information for their own use, and sold their LHC common stock on the basis of this information at artificially inflated prices in violation of their fiduciary duties.

200.    Plaintiff, as a shareholder and representative of LHC, seeks restitution from Myers and Indest, and Plaintiff seeks an order from this Court disgorging all profits and other benefits derived from Myers' and Indest's wrongful conduct and fiduciary breaches.

201.    Plaintiff, on behalf of LHC, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, unjust enrichment, corporate waste, and/or insider trading;

B.    Directing LHC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LHC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

59

- a provision to permit the shareholders of LHC to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of LHC's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters;

- a proposal to establish an active and responsible scientific advisory committee or equivalent committee, and to enact a charter that sets forth appropriate criteria for the appointment of qualified committee members, and which sets forth appropriate duties and responsibilities of such committee members directed to the review, vetting, and approval of material statements concerning the scientific safety, efficacy, or viability of the Company's  products or product prospects;

- a provision to implement and/or strengthen LHC's insider trading controls; and

- a provision to appropriately test and then strengthen the internal audit and control functions, including, without limitation, audit and control functions related to the Company's public statements about the safety and commercial viability or marketability of the Company's products or product prospects;

C.      Awarding to LHC restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation improperly obtained by the Individual Defendants, including, without limitation, ordering Myers and Indest to disgorge to LHC the proceeds they received through their illicit sales of LHC stock stemming from their knowledge and use of material, adverse, non-public information;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 30, 2013                    O'BELL LAW FIRM, LLC


                                   By:    /s/ Eric J. O'Bell
                                        _____
                                        Eric J. O'Bell (#26693)
                                        O'BELL LAW FIRM, LLC
                                        3500 North Hullen Street
                                        Metairie, Louisiana 70002
                                        Telephone: (504) 456-8677
                                        Facsimile: (504) 456-8653

                                        JOHNSON & WEAVER, LLP
                                        Frank J. Johnson
                                        *Pro Hac Vice Anticipated*
                                        Nathan R. Hamler
                                        110 West "A" Street, Suite 750
                                        San Diego, CA 92101
                                        Telephone: (619) 230-0063
                                        Facsimile: (619) 255-1856

                                        *Counsel for Derivative Plaintiff*